UNITED STATES of America

v.

Derrick GREEN.

No. S–93–0180.

United States District Court,
D. Maryland.

Oct. 14, 1994.

Lynne A. Battaglia, U.S. Atty., for the D. of Md., Bonnie S. Greenberg and Joseph H. Young, Asst. U.S. Attys., Baltimore, MD, for government.

James K. Bredar, Federal Public Defender for the D. of Md., and Michael T. CitaraManis, Asst. Federal Public Defender, Baltimore, MD, for defendant.

## MEMORANDUM AND ORDER

MALETZ, Senior Judge, Sitting by Designation.

On December 21, 1993, the defendant, Derrick Green, was convicted by a jury of conspiracy to possess with intent to distribute cocaine base and laundering the proceeds of an unlawful activity. The defendant is now before the Court for sentencing.[1]

---

**1.** The court will initially note that consistent with the law of this Circuit and the United States Sentencing Guidelines the court will use the terms cocaine base and crack interchangeably

■ In sentencing a narcotics offender under the United States Sentencing Guidelines, the sentencing court must initially determine the amount of narcotics involved in the offense. This quantity determination weighs heavily in the sentence that is ultimately imposed since it serves to establish the defendant's base offense level under the guidelines. In a case such as this, however, where no narcotics have actually been seized, the quantity determination is somewhat difficult. *See United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir.1990). In this case, the government relies upon the trial testimony of three "cooperator" witnesses concerning their alleged dealings with the defendant several years ago. In so testifying, these witnesses typically provided estimated ranges of the amounts of narcotics involved. The government contends that this testimony establishes that at a minimum the defendant is accountable for approximately 6.5 kilograms of cocaine base which translates to a base offense level of 40 under the guidelines. The defendant, on the other hand, submits that the testimony of these witnesses is so unreliable that it should be completely disregarded. *See* defense counsel's letter of February 21, 1994, at 2. The defendant suggests that he should only be held accountable for the small amount of cocaine base that was found upon him when he was arrested in 1988 and 1990, a total of approximately 1.68 grams. *Id.* This amount would result in a base offense level of 18.

■ It is the government's burden to prove drug quantity by a preponderance of the evidence. *See United States v. Brooks*, 957 F.2d 1138, 1151 (4th Cir.1992). While a substantial amount of estimation in determining quantity has been recognized as acceptable, a sentencing court nevertheless must "carefully scrutinize the government's proof to insure that its estimates are supported by a preponderance of the evidence." *United States v. Paulino*, 996 F.2d 1541, 1545 (3d

Cir.1993). The evidence relied upon by the government must have "sufficient indicia of reliability to support its probable accuracy." *See* U.S.S.G. § 6A1.3(a). Moreover, because of the impact of the quantity determination on the length of sentence, sentencing courts must "err on the side of caution." *United States v. Whiting*, 28 F.3d 1296, 1304 (1st Cir.1994); *United States v. Sims*, 975 F.2d 1225, 1243 (6th Cir.1992).

With these legal principles in mind, the court has carefully scrutinized the cooperator testimony at issue as well as the entire record in this case. For reasons which the court will proceed to discuss, it is the court's view that the quantity of narcotics that can properly and safely be determined in this case is approximately 2 kilograms. In so holding, the court follows a number of sentencing courts that have discounted, by some percentage, quantity testimony from cooperator witnesses. *See United States v. Whiting*, 28 F.3d 1296 (1st Cir.1994) (finding of 2 kilograms of cocaine a week despite statement by co-conspirator that defendant sold between 2½ and 4 kilograms per week, and estimates by other witnesses of even greater quantities); *United States v. Clemons*, 999 F.2d 154, 157 (6th Cir.1993) ("The court found that Strickland delivered drugs only once a day, five days a week although Strickland testified that he delivered drugs up to five times daily. The court also conservatively estimated each delivery to contain only one Dilaudid pill and one bag of cocaine whereas Strickland testified that his average delivery was one or two Dilaudid pills and two or three packets of cocaine."); *United States v. Paulino*, 996 F.2d 1541, 1548 (3d Cir.1993) ("In order to take into account the days in which sales were not that high or days in which no sales were made, the court reduced by 50 to 55 percent the government's proposed 225 kilogram estimate ...").[2]

throughout this opinion. *See United States v. Pinto*, 905 F.2d 47, 48 (4th Cir.1990); United States Sentencing Commission, *Guidelines Manual* at 86.

**2.** The court will also note that there of course have been other cases in which courts have completely rejected quantity testimony given by coo-

perator witnesses. *See United States v. Simmons*, 964 F.2d 763, 776 (8th Cir.1992) ("We hold, therefore, that Pierce's interview and testimony lack sufficient indicia of reliability to serve as a basis for calculating the quantity of cocaine base that properly could have been attributed to Bowers."); *United States v. Robison*, 904 F.2d 365, 371–72 (6th Cir.1990) (testimony of heavy drug

■ The government relies in the first instance upon the testimony of Carl Hollins. Hollins testified at trial that during an eight-month period in 1988 and 1989 he accompanied the defendant twice a week to Frederick where the defendant would buy quantities of crack ranging from a quarter to one-half of an ounce. Hollins also testified that during a nine-month period between 1991 and 1992, he purchased an average of three ounces of crack cocaine per week from the defendant.

Hollins' testimony regarding his drug dealings with the defendant stands in sharp conflict with prior statements that he made to law enforcement officials after his arrest in 1992. At that time, Hollins claimed to have purchased crack from the defendant on only five or six occasions totalling five or six ounces. Hollins' explanation for this discrepancy was that at the time of this interview he didn't want to "put himself in deeper with the state." (Transcript of Dec. 13, 1993 at 112).

Further, Hollins' assertion that in 1991 and 1992 he was purchasing an average of three ounces a week from the defendant appears to conflict with the testimony of another government witness, Charlie Davis. As will be discussed further, Davis testified at trial that during this time period he collected money for the defendant from the defendant's various runners including Carl Hollins. According to Davis, he received a total of between $10,000 to $12,000 a week. Utilizing the then existing street and wholesale prices of crack cocaine, the government has equated this dollar figure to be the equivalent of two ounces of crack per week. *See* Government's letter of Sept. 28, 1994. This is plainly inconsistent with Hollins' claim that he, alone, was receiving three ounces a week. In this regard, the court will note that there was no indication from Davis, nor anyone else for that matter, that the defendant was using anyone other than Davis to collect money.

As for Hollins' general credibility or lack thereof, he conceded at trial that after being convicted in a Maryland state court for distribution of crack, he intentionally lied to his probation officer and the court by misrepresenting that he was a drug addict. Hollins stated during his trial testimony in this case that he in fact has never used narcotics. Hollins conceded that he lied to the probation officer because he believed that if he was viewed as an addict, he might be dealt with more leniently at sentencing and that he might be admitted into a drug treatment program in lieu of prison.

Having observed Hollins both at trial and at defendant's sentencing hearing, it is the court's view that he is a true sociopath. While he is plainly bright, articulate and seemingly reasonable, it is clear to the court that Hollins will not hesitate to lie if he believes that it will suit his advantage. And it is not all together inconceivable that Hollins has come to believe that he will derive some benefit, be it material or psychological, by overstating the quantities with which the defendant was involved, thereby seeing to it that the defendant is incarcerated for a very long time. With that said, however, the court is also mindful of the fact that there was substantial corroboration from other witnesses at trial that Hollins bought and sold drugs on the defendant's behalf and that he was in fact the defendant's most successful associate. Accordingly, the court, while having misgivings about Hollins, will nevertheless, as a conservative estimate, accept one-third of the quantities that he has testified to. Thus, whereas Hollins testified that he purchased an average of three ounces of crack from the defendant a week over a nine-month period, the court will attribute to the defendant one ounce a week for a total of 36 ounces or 1,020 grams.[3]

Similarly, as to Hollins' testimony that he assisted the defendant in purchasing a total of 16 to 32 ounces in Frederick, Maryland, the court will attribute to the defendant eight ounces or 227 grams.

The court will now turn to the testimony of Charlie Davis. As the court has just discussed, Davis testified that between August and December 1991, the defendant was tak-

user with "hazy" memory not sufficiently accurate to permit the district court to aggregate a specific quantity of cocaine in determining the base offense level).

3. In this regard, the court notes that one ounce is equal to 28.35 grams.

ing in between $10,000 and $12,000 per week. On the basis of this testimony, the government contends that the defendant is accountable for an additional 24 ounces of crack. The government, however, fails to recognize that it is double counting the amounts that Green allegedly distributed to Hollins during this same time period. The government has counted both the quantities that Hollins claimed to have received from the defendant and then counted again the proceeds from those quantities that Hollins allegedly funneled back to the defendant through Davis. Accordingly, the court will necessarily subtract from the 24 ounces that Davis testified to, the 12 ounces that Hollins has already attributed to the defendant for this time period.

Davis also testified that on two occasions in the fall of. 1991 the defendant went to Florida and left him with crack to distribute to his runners. On the first occasion, Davis testified to "maybe four" ounces and on the second trip a "few." (Transcript of Dec. 14, 1993, at 15, 19). On the basis of this testimony, the government seeks to attribute an additional ten ounces of crack to the defendant. It would appear again, however, that the government is double counting the same crack cocaine. The quantities that the defendant allegedly left with Davis would appear to have already been accounted for by Davis' testimony regarding the proceeds that he recovered from the defendant's runners. Accordingly, these quantities will not be counted a second time.

■ Finally, Davis testified that on one occasion he saw the defendant with 22 ounces of crack cocaine. In the court's view, however, Davis' testimony in this regard is unbelievable. For one thing, this testimony stands in conflict with that of the other government witnesses who indicated that Green's *modus operandi* was to purchase crack from his suppliers in single ounce quantities or less, distribute it to his runners and then return to his suppliers for more after receiving the proceeds from the runners. (Transcript of Dec. 13, 1993, at 15; Transcript of Dec. 7, 1993, at 20, 45, 51–54). Further, no other witness testified to the defendant ever having such a large stash of narcotics. In this regard, the court finds Davis' credibility at about the same level as Hollins'. Like Hollins, Davis has previously lied to a sentencing court in regard to his need and desire for drug rehabilitation. Davis also previously provided a statement to state law enforcement authorities concerning an alleged kidnapping that the defendant perpetrated. While Davis testified in this case that the defendant in fact committed that kidnapping, Davis previously represented to a state court judge that the event never took place. It is thus clear to the court that Davis has little trouble lying in a court of law.

In sum, the court will attribute to the. defendant 12 ounces of crack on the basis of Davis' testimony which is equal to 340 grams.

■ Lastly, the government relies upon the testimony of Jeffrey Miles. The government represents that Miles testified that during a nine-month period in 1986 and 1987 he drove the defendant to Frederick every week and there purchased for the defendant 14 grams of crack for a total of 504 grams. A review of the trial transcripts, however, reveal that Miles never testified to the amount of crack that he was buying for the defendant in Frederick, nor did Miles indicate the time period involved. Accordingly, the government's estimation of 504 grams is unsupported by the testimony.[4] To attribute any amount to the defendant on the basis of this testimony would be pure speculation, which the court will not accept.[5]

---

4. In so holding, the court does not intend to suggest that government counsel intentionally misrepresented the specifics of Miles' testimony. In all fairness to government counsel, Miles' testimony was extremely difficult to follow and at times bordered on the incomprehensible.

5. In this regard, the court notes that Miles did testify that the defendant was making "anywhere in the range of several thousand dollars a week based on the trips I took him on." Miles, however, provided no foundation for this highly imprecise assertion. This claim was also contradicted by the testimony of the defendant's girlfriend of the time, Stephanie Holland, who testified at the defendant's sentencing hearing that the defendant did not have much money during this time period and was constantly borrowing money from her. Similarly, Miles himself acknowledged that the defendant did not even have his

The government next represents that Miles testified that between September 1988 and June 1989 the defendant made weekly purchases of between one and two ounces of crack cocaine from an individual named Cokie Roberts, representing at a minimum an additional 1,000 grams of crack. Again, however, the transcript reveals otherwise. While Miles testified that he accompanied the defendant twice a week to buy crack from Cokie Roberts, Miles never indicated the amount of weeks involved, nor the amount of crack typically purchased. The government points to Miles' testimony at page. 42 of the December 7th transcript where he states that he sold drugs for the defendant over a six-month period. But at page 46 of the transcript where he discusses the defendant's purchases .from Cokie Roberts, Miles was specifically asked "how long did [the defendant] continue" to buy crack from Cokie Roberts, to which Miles replied "that continued for *awhile*, until him and Cokie like kind of had a falling out." (Emphasis added) Similarly, while Miles testified that the defendant purchased about an ounce of crack from Cokie Roberts at their first meeting, Miles never indicated the amounts that were purchased on subsequent occasions. Accordingly, the court is again left with undeveloped testimony from which any estimate must be very conservative. In this circumstance, the court will attribute to the defendant ten trips to Cokie Roberts' establishment and a total of ten ounces of crack cocaine or 283 grams.

The government also represents that Miles testified that on three separate occasions the defendant received at least one ounce of crack cocaine from certain Jamaican suppliers. In actuality, however, Miles testified that on the last of these three occasions no purchase was in fact made. (Tr. at 63). Accordingly, the court will only attribute two ounces on the basis of this testimony, an additional 57 grams.

Finally, Miles testified that on one occasion defendant handed him two and a quarter ounces because he (the defendant) had become embroiled in a fight with two women and the police had arrived upon the scene. This event was, in fact, corroborated by the defendant himself in a conversation that was surreptitiously recorded by one of his acquaintances, Sonny Campbell. Accordingly, an additional 64 grams will be attributed to the defendant. In sum, the court finds a total of 404 grams on the basis of Miles' testimony.

Against this background, the total quantity of crack on the basis of all three witnesses is 1,971 grams. Under the guidelines, the base offense level for a quantity of crack between 1.5 and 5 kilograms is 38.

Having gone through all of the above testimony, the court will add that had the record in this case supported the government's position that the defendant is accountable for more than 5 kilograms, the court would have undertaken a two-level downward departure on the basis of the Sentencing Commission's proposed amendment to the sentencing guidelines pursuant to which the maximum base offense level for all narcotics offenses will be level 38. As the parties are well aware, this proposed amendment will become effective November 1 of this year absent a congressional veto. Since during the past six years Congress has yet to veto any of the Sentencing Commission's many amendments to the guidelines, it would appear highly likely that the amendment will indeed become effective on November 1. In the court's view, it would be a singular miscarriage of justice if this defendant was sentenced on the basis of a higher base offense level than would be applicable to him if this proceeding was held three weeks hence.

*Adjustment for Organizer*

The next major issue relates to whether the defendant should receive a four-level enhancement pursuant to U.S.S.G. § 3B1.1 on the ground that he was the organizer and leader of the instant conspiracy. U.S.S.G. § 3B1.1 provides that "if the defendant was an organizer or leader of a criminal activity that involved five or more partici-

own place to live or a car during this time period. Accordingly, in the court's view, Miles' vague and unsupported statement regarding the defendant's purported earnings does not support the government's contention that the defendant bought and sold 14 grams of crack every week for nine months.

pants or was otherwise extensive, increase by four levels." In this regard, the court heard testimony at trial from numerous witnesses that the defendant led an extensive crack distribution organization whose members included, among others, Carl Hollins, Larry Moten, Kip Russell, Bobby Armstrong, Kenzell Jessie, Carlton Briscoe, and Jeffrey Miles. While many of these witnesses, such as the three that have already been discussed at length, were far from model citizens, their testimony in this particular regard was mutually corroborative and in the court's view reliable. Accordingly, the four-level organizer enhancement will be applied. The defendant's offense level is, thus, 42.

### Obstruction of Justice

▮ The court will now address the issue of obstruction of justice. The government first contends that a two-level upward adjustment for obstruction of justice is justified under U.S.S.G. § 3C1.1 because the defendant allegedly attempted to persuade a government witness, Robert Armstrong, to commit perjury while they were incarcerated together prior to trial. Mr. Armstrong's testimony on this issue, however, was rather vague and confused. On his direct examination, Mr. Armstrong stated that in November 1993 he had a "brief conversation" with the defendant during which the defendant asked him "what he was going to say" and then told him that he could just "say that [he] didn't remember anything." (Transcript of July 5, 1994, at 8, 9). Armstrong was then asked, in a leading fashion, whether defendant had said anything about "money or drugs," to which Armstrong replied, "nothing about drugs." (*Id.* at 9). When then asked what exactly the defendant had said, Armstrong stated that the defendant had advised that he "wouldn't have to worry about commissary," which Armstrong took to mean that the defendant would see to it that he had "money in [his] account every week." (*Id.* at 9). How-

ever, when again questioned a moment later, as to whether the defendant had given him any suggestions as to how he could testify, Armstrong's response was somewhat different. Instead of again stating that the defendant had told him he could simply say that he didn't remember anything, Armstrong now stated that the defendant had "not really" given him any advice. (*Id.* at 10). He then added for the first time that the defendant suggested that he testify that the defendant "gave [him] money, but [that] it had nothing to do with drugs." (*Id.*). Armstrong gave no further particulars of this alleged conversation such as, for example, his response to this alleged overture.

· On cross-examination, Armstrong's testimony continued to waver. For the first time, he indicated that he had actually had several conversations with defendant concerning his possible testimony. (*Id.* at 17). However, he conceded that "basically [the] only thing I really remember was the fact that he didn't want me to testify against him." (*Id.*)[6] In response to questions of the court, Armstrong also indicated that at no time had the defendant threatened him in any way. (*Id.* at 22)[7]

In addition to the fact that his testimony was vague, inconsistent and undeveloped, the court finds that Armstrong's credibility is minimal. Besides being a repeat offender, his testimony in this case was in large part motivated by his desire to get out of prison and into a drug rehabilitation center. Under these circumstances, the court finds that Armstrong's uncorroborated and unsubstantiated testimony does not prove by a preponderance of the evidence that the defendant attempted to obstruct justice within the meaning of U.S.S.G. § 3C1.1.

▮ The government also seeks the obstruction enhancement on the ground that the defendant's brother attempted, through intimidation, to persuade another government witness, Kenzell Jessie, not to testify.

---

**6.** Armstrong then went on to restate that the defendant advised him that he could testify that he didn't remember anything and that the money that was given to him was not for drugs.

**7.** Armstrong also stated that he had been informed by another inmate, Curtis Mason, that he

(Mason) had overheard a conversation between the defendant and another individual in which the defendant was asked whether he wanted Armstrong to be hurt, to which the defendant replied "no, not at this time."

The government, however, presented no evidence which would indicate that defendant had any knowledge of this incident much less that he played any role in it. There is simply no basis to hold the defendant accountable for the actions of his brother absent any evidence that the defendant in some manner procured, directed or aided and abetted those actions.

 Finally, the government also seeks an obstruction enhancement on the basis of the trial testimony of Sonny Campbell. Mr. Campbell testified that as he and the defendant were being escorted by a deputy marshal to the cellblock area of this courthouse following one of the daily trial sessions, the defendant threatened another prospective government witness, Jeffrey Crampton. Significantly, however, Mr. Campbell's testimony in this regard was not corroborated by the deputy marshal who was present when this alleged threat was made. Nor was it corroborated by Mr. Crampton. As for Campbell's credibility, in addition to having a prior perjury conviction, Campbell testified that he had previously tape recorded a conversation with the defendant in an effort to "put him in jail." (Transcript of Dec. 8, 1993, at 10). Campbell further acknowledged that he was trying to get back at the defendant through his testimony. (*Id.*). Accordingly, the court is not persuaded by Mr. Campbell's uncorroborated testimony that the defendant threatened Mr. Crampton. In short, the enhancement for obstruction will not be allowed.

*Possession of a Weapon*

The court will now turn to the issue of whether the defendant should receive a two-level enhancement for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b). In support of this enhancement, the government relies exclusively on the testimony of Jeffrey Miles. Miles testified that on one unspecified occasion he and the defendant were walking on North Street when they encoun-

tered a "scared Eugene Campbell" who was holding a 9 mm. pistol.[8] (Transcript of Dec. 7, 1993, at 69). According to Miles, Campbell handed the pistol to the defendant, and the defendant handed Campbell an ounce of crack cocaine. Miles, however, did not indicate that the gun was given to the defendant in exchange for, or as payment for, the crack. After receiving the pistol from Campbell, the defendant allegedly kept it overnight and then gave it to Miles the following day. Miles testified that he then brought the gun to his mother's house. No further mention of the gun was made by Miles or any other witness.[9]

 In the court's view, Miles' uncorroborated testimony on this issue was vague, undeveloped and completely unreliable. In this regard, the court has substantial reasons to question Miles' testimony. First, Miles testified that he was constantly high on crack during the time period to which he testified. (Transcript of Dec. 7, 1993, at 25). His years of excessive crack use were in fact evident during his testimony which as noted above was extremely convoluted and difficult to follow. Accordingly, Miles' perception and recollection of this alleged gun incident is highly questionable.

Second, Miles' character for truthfulness is also of significant concern. Aside from his lengthy criminal record, Miles appeared to the court as a particularly shifty witness, lacking credibility. For these forgoing reasons, Miles' uncorroborated testimony on this issue will not be credited.

 The court will also note that even if Miles' testimony regarding the gun is to be believed, it would still not support the enhancement. Under U.S.S.G. § 2D1.1(b), there must be some connection between the gun in question and the instant offense. Application Note 3 to this guideline provides that the adjustment should not be applied if it is "clearly improbable that the weapon was connected with the offense." Accordingly, the mere fact that a narcotics defendant pos-

---

8. Miles provided no explanation as to who Mr. Campbell is, of what he was frightened, or why he was holding a pistol.

9. In light of the fact that the defendant only kept the gun overnight and got rid of it the next day, it would strongly appear that he was not accepting the gun as payment for the crack that he allegedly provided to Campbell.

sessed a firearm is not automatic grounds for the enhancement. Application Note 3, for example, goes on to provide that "the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet."

As discussed above, Miles' testimony was simply that the defendant was handed the gun, that he possessed it for one night, and that he then gave it to Miles who brought it to his mother's home where, as far as the record is concerned, the gun has remained to the present day. There was no evidence that this alleged gun, or any other gun for that matter, was ever used, carried or displayed in furtherance of the instant conspiracy. Accordingly, in the court's view, the alleged gun in this case is the functional equivalent of the hunting rifle used in the Sentencing Commission's example.

In sum, the court finds that the defendant's final adjusted offense level is 42. Under the guideline sentencing table, the sentencing range for an offense level of 42, regardless of criminal history category, is 360 months to life.

*Statutory and Constitutional Arguments*

The court will now turn to the various constitutional challenges that the defendant has raised.

The defendant first contends that the sentencing guidelines applicable to cocaine base offenses violate the equal protection clause of the Fifth Amendment. The defendant bases this argument on the fact that the guidelines equate one gram of cocaine base to 100 grams of powder cocaine. The result of this 100 to 1 ratio is that crack offenders, on average, receive significantly longer sentences then cocaine offenders. For example, if the defendant had been a member of a two-kilogram cocaine conspiracy, rather than a two-kilogram crack conspiracy, his base offense level would have been 28 rather than 38 and his final adjusted offense level would thus have been 32 rather than 42. The guideline sentencing range for an offense level of 32, combined with the defendant's criminal history of IV, is 168 to 210 months.

In addition, as the defendant correctly points out, more than 90 percent of all persons convicted of crack offenses are African-Americans. By contrast, only 27.1 percent of those convicted of cocaine offenses are black. Further, the defendant submits that as a medical matter there is no significant distinction between crack and powder cocaine. In support of this argument, the defendant has included as an exhibit to his sentencing memorandum the testimony of a Dr. George Schwartz from the case of *United States v. Maske,* Crim. No. 92–132, District Court of Columbia, February 17, 1993. The defendant has also submitted the testimony that several other doctors provided in *United States v. Davis,* 93–Cr–234–1 (D.N.Ga.1994).

As the defendant acknowledges in his sentencing memorandum, the federal circuit courts of appeal, including the Fourth Circuit, have unanimously rejected the precise equal protection claim that the defendant here raises. *See United States v. D'Anjou,* 16 F.3d 604, 612 (4th Cir.1994); *United States v. Frazier,* 981 F.2d 92, 95 (3d Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1661, 123 L.Ed.2d 279 (1993); *United States v. King,* 972 F.2d 1259, 1260 (11th Cir.1992); *United States v. Harding,* 971 F.2d 410, 412–14 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1025, 122 L.Ed.2d 170 (1993); *United States v. Simmons,* 964 F.2d 763, 767 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992); *United States v. Williams,* 962 F.2d 1218, 1227–28 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992); *United States v. Watson,* 953 F.2d 895, 898 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992); *United States v. Lawrence,* 951 F.2d 751, 755 (7th Cir.1991); *United States v. Cyrus,* 890 F.2d 1245, 1248 (D.C.Cir.1989).

 The defendant attempts to distinguish this case from these precedents on the ground that they were decided before much of the evidence regarding the disproportionate impact of the crack cocaine penalties had become available. *See* defendant's sentencing memorandum at 17. Defendant argues that in light of the development of this evidence the Court should apply a "strict scrutiny" analysis to his equal protection claim, rather than the substantially more deferen-

tial "rational basis" test that has been applied in all of the above-cited cases. *Id.* Contrary to the defendant's argument, however, the Fourth Circuit in *D'Anjou* specifically noted that the Sentencing Commission had released data confirming that "92.6 percent of crack defendants are black and only 4.7 percent are white, while 29.7 percent of cocaine defendants are black and 45 percent are white." 16 F.3d at 612, n. 3. Despite these statistics, the Fourth Circuit found the rational basis test to be appropriate because the defendant in *D'Anjou* was unable to produce any evidence either of discriminatory application of the guidelines or a discriminatory purpose on the part of those who enacted the guidelines. *Id.* The defendant here has likewise failed to produce any such evidence. Accordingly, the Court is constrained to apply the rational basis test in this case. Under that standard, the defendant's equal protection claim plainly fails. In this regard, the Court notes that Dr. Schwartz, whose opinion the defendant relies upon, acknowledged during his testimony that there are in fact significant differences between crack and powder cocaine: (1) that since crack is typically smoked while powder cocaine is typically snorted, crack provides a quicker and more intense high than powder cocaine, (2) that this more intense high may be induced by a lesser dosage unit of crack as opposed to powder cocaine, (3) that crack is, therefore, available to users on the street at a substantially lower price than powder cocaine, and (4) that there has been a tremendous amount of violence associated with the distribution of crack. Defendant's sentencing memorandum Exhibit # 1 at 68–74. It is these distinctions that the federal courts have repeatedly made reference to in finding a rational basis for the guidelines' disparate treatment of powder cocaine and crack. *See, e.g., United States v. Jones,* 979 F.2d 317, 319 (3d Cir.1992); *United States v. King,* 972 F.2d 1259, 1260 (11th Cir.1992).

Closely related to his equal protection argument, the defendant also contends that the guidelines, as applied to this case, violate the Eighth Amendment prohibition against cruel and unusual punishment. Defendant submits that by drawing a substantial distinction between two forms of essentially the same drug, the guidelines are arbitrary and capricious and, therefore, in violation of the Eighth Amendment. This argument also has been uniformly rejected by the federal courts. *See United States v. Cyrus,* 890 F.2d at 1248; *United States v. Frazier,* 981 F.2d at 95; *United States v. Pickett,* 941 F.2d 411, 418 (6th Cir.1991); *United States v. Simmons,* 964 F.2d at 767. As discussed above, the courts have held that there are significant differences between crack and powder cocaine and that it is, therefore, not arbitrary and capricious to treat them differently. *See Frazier,* 981 F.2d at 96.

In yet another variation of this argument, the defendant contends that, pursuant to the rule of lenity, he should be sentenced as if his offense was for cocaine rather than crack. In support of this argument, the defendant relies upon the case of *United States v. Davis,* No. 93–Cr–234–1 (N.D.Ga.1994). The *Davis* court found that as a matter of scientific fact cocaine and cocaine base are "synonymous terms referring to the same substance having the same molecular structure, molecular weight and melting point." The court therefore went on to hold that there is "unquestioned ambiguity on the face of the [drug abuse prevention and control] statute, and the rule of lenity must therefore be applied, ... and the heightened penalties for cocaine base ... disregarded."

Unfortunately for the defendant, however, the district court's holding in *Davis* is in direct conflict with the numerous decisions of the Fourth Circuit that have held that the terms cocaine base and cocaine, as they are used in the statute and the guidelines, rationally refer to two distinct substances. *See e.g., United States v. D'Anjou; United States v. Bynum,* 3 F.3d 769, 774–75 (4th Cir.1993). As discussed above, the Fourth Circuit has also specifically held that the term cocaine base refers to crack. *United States v. Pinto,* 905 F.2d at 47. Likewise, a recent amendment to the sentencing guidelines explicitly provides that "cocaine base ... means crack" and that crack is the "street name for a form of cocaine base, usually prepared by processing cocaine by hydrochloride [powder cocaine], and sodium bicarbonate, and usually appearing in a lumpy rocklike form." It is

undisputed that the drugs distributed by the defendant meet this definition of crack and cocaine base. Accordingly, the court will necessarily decline to follow the *Davis* decision.

Finally, the defendant requests that the Court depart downward from the sentencing guidelines. 18 U.S.C. § 3553(b) authorizes sentencing courts to undertake downward departures if the court "finds that there exists an aggravating or mitigating circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines."

As a basis for a downward departure, the defendant again focuses upon the 100 to 1 crack to powder cocaine ratio embodied in the guidelines. The defendant contends that in promulgating the guidelines the Sentencing Commission failed to take into consideration that there is no significant distinction between crack cocaine and powder cocaine, and the disproportionate impact that the 100 to 1 ratio has upon African–Americans.

In *United States v. Bynum,* 3 F.3d at 775, the Fourth Circuit specifically held that since the crack-cocaine guidelines do not violate the equal protection clause, the Sentencing Commission's alleged failure to consider these factors is not a proper basis for departure. Accordingly, the defendant's request for a departure will necessarily be denied.

 The defendant also requests a downward departure on the ground that he is only 27 years old. As the defendant acknowledges "age (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.1. In the Court's view, there is nothing extraordinary about the defendant's age. *See United States v. Summers,* 893 F.2d 63, 69 (4th Cir.1990) ("Summers is a 23 year old adult. There is nothing extraordinary about his age and the district court clearly erred in basing a departure on this fact.").

For all of the foregoing reasons, the court imposes sentence as follows:

On count 1, the defendant is sentenced to 360 months incarceration, concurrent to his present state sentence.

On count 2, the defendant is sentenced to 120 months, concurrent to the sentence imposed on count 1, and concurrent to his present state sentence.

In addition, the defendant is sentenced on count 1 to 5 years supervised release upon his release from prison.

On count 2, the defendant is sentenced to 3 years supervised release, concurrent to the period imposed on count.

No fine will be imposed. However, a special assessment of $100 is required by 18 U.S.C. § 3013.