**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 11 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

SCOTT HIGGINS, also known as Eloy
Baldonado,

      Defendant - Appellant.

No. 00-2440

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

KATIE SUE CAPLE,

      Defendant - Appellant.

No. 00-2461

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

RONALD L. JINKS,

      Defendant - Appellant.

No. 00-2472

Submitted on the briefs:[*]

Norman C. Bay, United States Attorney, and David N. Williams, Assistant United States Attorney, Albuquerque, New Mexico, for Plaintiff-Appellee, United States of America.

Ray Twohig, Albuquerque, New Mexico, for Defendant-Appellant Higgins; Billy R. Blackburn, Albuquerque, New Mexico, for Defendant-Appellant Caple; and Todd Hotchkiss, Frechette & Associates, P.C., Albuquerque, New Mexico, for Defendant-Appellant Jinks.

Before **SEYMOUR** and **HOLLOWAY,** Circuit Judges, and **VANBEBBER**, District Judge.[**]

**HOLLOWAY**, Circuit Judge.

Defendants-appellants Katie Sue Caple, Scott Higgins and Ronald L. Jinks

---

[*]All three Defendants-appellants originally requested oral argument, and these cases were scheduled to be argued on September 13, 2001. Arguments on that date had to be cancelled because of transportation disruptions in the wake of the tragic events of September 11, 2001. The parties then agreed to submit written statements in lieu of oral argument. The causes are therefore ordered submitted without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).

[**]The Honorable Thomas G. VanBebber, Senior District Judge of the United States District Court for the District of Kansas, sitting by designation.

were charged with using a house outside the city limits of Albuquerque as a place to manufacture methamphetamine. Specifically, the indictment charged each with three drug offenses: conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(a) & 846; maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine in violation of 21 U.S.C. § 856 and 18 U.S.C. § 2; and possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C) and 18 U.S.C. § 2. A fourth person, Ms. Marquita Ortiz, was also indicted on those three counts plus one count of possession of ammunition after a former felony conviction. Ms. Ortiz entered into a plea agreement with the government and was a key witness at the trial of the three Defendants.

In a joint trial, all three Defendants were convicted on all three counts. Mr. Higgins was subsequently sentenced to three concurrent sentences of 235 months' imprisonment, Ms. Caple to three concurrent sentences of 151 months, and Mr. Jinks to three concurrent sentences of 144 months. Each has appealed from both the conviction and the sentence imposed. For the reasons set out below, we affirm the convictions of all three Defendants. We hold, however, that the sentences imposed on the Defendants must be reconsidered because the calculation of drug quantity by the district court at the sentencing hearing lacked a proper evidentiary basis.

# I

The house at which Defendants were arrested was described as being in the mountains east of Albuquerque in the town of Tijeras. The area was remote, with only a few other houses. The house had been noted by the sheriff's office since October 1998 as an abandoned place sometimes used by transients. On January 7, 1999, a health inspector toured the place. He found chemicals lying around and noted a strong chemical smell. There was no power or water and the toilet had been dismantled. Hypodermic needles, along with much other trash, littered the floors. The inspector said it was hazardous just to walk around the property. The inspector believed that a methamphetamine lab had been operating at the location, while another government witness, one of the deputies who periodically checked the place, said he saw no precursor chemicals and only one syringe. The inspector issued a complaint to begin condemnation proceedings.

About a month later, on the morning of February 8, 1999, the owner of the adjacent property noticed that a power cord had been plugged into his line at the utility pole and that it appeared to run to the abandoned house. He unplugged the cord and called the sheriff's office to report a possible theft of electricity. Three deputies responded to the call. One went to see the complainant while two went to the abandoned house. At the time, they believed that no one was supposed to be there because condemnation proceedings had been commenced against the property.

On arriving at the house, the deputies first encountered Ms. Ortiz and then Ms. Caple. The sequence of events which followed was disputed, but under the circumstances of the case it was not necessary for the disputes to be settled at the suppression hearing or at trial. The disputes about the sequence are not material to the issues on appeal either, so we merely note that the sequence is somewhat in doubt.

Ms. Caple gave a false identification. Both women said that they were there to clean the place up. Ms. Ortiz told them there was a gun inside. Ms. Caple said there might be a gun in the house, or else "the boys" might have taken it with them. The deputies were concerned about Ms. Caple's dog, which apparently seemed menacing. They asked her to tie it up, but she told Ms. Ortiz to take it in the house. In any event, the deputies entered the house, seeing chemicals and apparatus in plain view; they also uncovered two or three coffee filters containing a powdery substance. Ms. Caple said that these things had been there when they came. There was a strong chemical smell in the house. The deputies found a small quantity of methamphetamine in Ms. Ortiz's jacket and a pistol under a pillow.[1] The two women were arrested at some point in these events.

About an hour after the two deputies had first arrived at the scene, Defendants

---

[1]None of the Defendants was charged with possession of the gun, although at sentencing it was used to increase the offense levels of all three Defendants under U.S.S.G. § 2D1.1(b)(1).

Jinks and Higgins drove up and were arrested. By that time, the deputies had called in DEA agents. Jinks and Higgins were cooperative. One of them told the officers right away that there were chemicals in the car. The agents found several jars of chemicals in the car including methamphetamine oil, a substance which a government witness at trial said was produced in the process of methamphetamine manufacture.

At trial, Ms. Ortiz testified that she and the three other Defendants really were cleaning up the house but were also using it for methamphetamine "cooks" and had been in and out of the house several times before the day of the arrests. The four had arrived at the house between 1 a.m. and 3 a.m. on the day of their arrests. Ms. Ortiz said she was a user who sold the drug to support her habit, but did not manufacture it. She testified that Ms. Caple was the best female methamphetamine cook in the area, that Mr. Higgins also knew how to make it, and that Mr. Jinks was learning. Caple and Higgins had been making methamphetamine in two different rooms of the house at the same time, using different methods, Ms. Ortiz testified. Jinks had been helping Higgins some and also walking around outside the house some of the morning. Something had gone wrong with Mr. Higgins' batch, and he, with Mr. Jinks accompanying him, had taken the product with him in search of an acquaintance who could assist them in the process. That was the reason that jars of chemicals were in the car when Higgins and Jinks arrived at the house on the day of

the arrests.

Ms. Caple testified at trial. She said she was engaged to Mr. Jinks and had been working odd jobs. She needed a place to live and Mr. Higgins had offered to let her live in the house while they cleaned and refurbished it. She said she had been to the house once before the day of the arrests, and returned that day to begin cleaning. She denied any drug use, testifying that her diabetic condition precluded her from using drugs. She could tell from the syringes, chemicals and apparatus, however, that someone had been using the abandoned house for drug activity. Jinks and Higgins had left that morning to see the owner, she said, because they were concerned and angry that the place was dangerous because of all the chemicals. They took some of the chemicals with them because they planned to ask the owner what he wanted done with them. She said when the officers arrived she gave them the false identification because she had outstanding traffic tickets and because she didn't have her purse with her.

Mr. Higgins also testified at trial. He said he had a verbal agreement with the owner to clean up and fix up the house. Mr. Higgins had moved some of his property into the house, including some musical equipment. He gave the same explanation as Ms. Caple for his arrival on the day of the arrests with the jars of chemicals in the car, namely that he had become angry and concerned about the quantity and noxiousness of the chemicals on the premises and had gone with Mr. Jinks to try to

find the owner and ask what he wanted done with them.

Mr. Higgins denied having brought any chemicals to the premises and denied having anything to do with methamphetamine manufacture. VI Higgins App. 1362-63, 1375.

## II

Mr. Higgins filed a pretrial motion to suppress evidence, and the district judge held an evidentiary hearing on the motion.[2] After hearing the parties' evidence, the judge ruled that Defendants did not have an expectation of privacy in the premises that society would recognize as reasonable. Consequently, the judge denied the motion to suppress without ruling on the legality of the nature of the search. Mr. Higgins now argues that the district court erred in ruling that he did not have a reasonable expectation of privacy in the premises.

Mr. Higgins does not contend that the search was unlawful. Rather, he appears to seek only remand to the district court for further factual development and rulings, in the event that this court should be persuaded that the district court's ruling was in error. Of course, this court is always obligated to consider whether any errors we find resulted in denial of substantial rights. 28 U.S.C. § 2111. Therefore, counsel

_____

[2]The docket sheet reveals that Defendant Jinks filed a paper joining Mr. Higgins' motion. Only Mr. Higgins raises the issue on appeal, so we are not concerned with whether either of the other Defendants properly raised the issue below.

should at least show that there would be a point in a remand, that is, that there is some basis in this case on which the search could be held illegal. Nevertheless, we will explain why in our view there was no error in the district court's ruling.

**A**

Three witnesses testified at the hearing on the motions to suppress. Defendants Higgins and Caple testified for the defense; the government called Frank Chavez, a deputy sheriff for Bernalillo County. Mr. Higgins testified that he had known Mr. Harry Sappington, the owner of the property, for about eighteen months. Mr. Sappington had tried to get a loan to repair the property from Mr. Higgins' father's company. The loan application was not approved because of the condition of the property. According to Mr. Higgins, the windows were all broken out and the doors had been knocked from their hinges. The house was filled with debris, including chemicals.

Higgins and Sappington had discussed an arrangement under which Higgins would first clean up and then repair the property. In exchange for his work, Mr. Higgins would be permitted to live on the premises without payment of rent and would eventually share in the proceeds of an insurance claim that Mr. Sappington intended to pursue, which apparently was to have been based on damage to the property by vandals. III Higgins App. 456-57.

Mr. Higgins testified that he had begun cleaning up the property about two

days before his arrest, and that he had spent twelve to eighteen hours on cleaning the place over this brief period. He had not begun exercising his right to reside at the property because the property was still much too filthy and unprotected from the elements. The property lacked electricity, and the only potential source of heat was a fireplace. The plumbing had been severely damaged. None of the toilets functioned.

Although Mr. Higgins had not moved into the property, he had moved some of his personal property there, including musical equipment. The property was enclosed by a chain link fence, and Mr. Higgins had the key to the padlock on the fence. Unfortunately, the record reveals nothing else about this fence. It is unclear whether the fence surrounded only the immediate area of the house, for example, or a larger area. It may have been the latter because there is some indication that the padlocked gate was at the entrance to the driveway, which was some distance from the house itself. There was no evidence about the height of the fence or its condition. In sum, the record simply does not reveal whether the padlocked fence was a meaningful deterrent to access to the house.

Defendant Caple testified at the suppression hearing that the plumbing under the kitchen sink of the property had been disconnected or damaged. She said this was discovered when they had attempted to dispose of some chemicals by pouring them down the sink. Vapors came out of the sink and investigation revealed that the

liquid was simply going into the ground under the house, releasing vapors in the process, because the plumbing did not function. We note that much of Ms. Caple's testimony concerned her encounter with the deputies immediately before and after their entry into the house, testimony which seems to have been intended to support an argument that if Ms. Caple gave consent to the officers' entry, it was not truly voluntary. As such, this testimony had little to do with the issue which concerns us now – whether Mr. Higgins had a legitimate expectation of privacy in the premises.

The government's witness at the suppression hearing, Deputy Chavez, testified about a conversation he had with Mr. Sappington, the owner of the property. Deputy Chavez testified that he asked Mr. Sappington about the alleged agreement with Mr. Higgins for Higgins to clean up and repair the property in exchange for the right to reside there temporarily. According to Deputy Chavez, Mr. Sappington said that he had discussed the idea with Mr. Higgins and had agreed that Higgins could submit a bid for doing work on the property but that Higgins had not followed through by actually submitting a bid. III Higgins App. 504-05.

**B**

The district judge ruled that Mr. Higgins had failed to establish that he had a legitimate expectation of privacy in the property. The judge observed that as a member of an apparent cleaning crew, Mr. Higgins might have a reasonable expectation of privacy in his cleaning supplies or in a vehicle used to transport them.

This would be insufficient to create a reasonable right of privacy in the property generally, however, the judge decided. III Higgins App. 502, 509-13 ("But I don't understand why, because you have a right to temporarily be there for a specific purpose, why you would have a general expectation of privacy. I don't think society is prepared to recognize that is where I am at this point."). The judge said he was convinced by the cases that the expectation of privacy would not apply to the facts presented here. *Id.* at 513.

### C

On review of a denial of a motion to suppress evidence,

we consider the totality of the circumstances and view the evidence in a light most favorable to the government. We accept the district court's factual findings unless those findings are clearly erroneous. The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court. Keeping in mind that the burden is on the defendant to prove that the challenged search was illegal under the Fourth Amendment, the ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable de novo.

*United States v. Gordon*, 168 F.3d 1222, 1225 (10th Cir. 1999) (internal citations omitted).

As noted, in this case the district judge did not rule on the legality of the search, per se, deciding instead that Mr. Higgins had failed to show that his own Fourth Amendment rights were implicated. "A defendant may not challenge an allegedly unlawful search or seizure unless he demonstrates that his own

-12-

constitutional rights have been violated." *United States v. Rubio-Rivera*, 917 F.2d 1271, 1274 (10th Cir. 1990). To so demonstrate in the context of a search, the defendant must show that he had a subjective expectation of privacy in the premises searched and that "society is prepared to recognize that expectation as reasonable." *United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995). We review *de novo* the ultimate issue of whether Mr. Higgins' expectation of privacy was one that society would consider reasonable, so that he may be permitted to challenge the search of the house. *Id.*[3]

We begin our analysis by noting that it is not clear whether the district judge accepted or rejected Mr. Higgins' testimony about having authority to be on the property and having the intent to reside there once the place had been made habitable. Even though the government produced evidence which called into doubt the existence of the arrangement as described by Mr. Higgins, and the judge ultimately ruled in favor of the government, the judge's statements, such as his comment describing Defendants as a cleaning crew, suggest that he might have accepted Mr. Higgins' version of the arrangement or that he may have concluded that it was not necessary to resolve that disputed issue of fact because he reasoned that Higgins' motion must fail even if the facts were as Higgins testified. We note also

---

[3]The Supreme Court has repeatedly insisted that we not use the term "standing" as shorthand for a defendant's capacity to challenge a search. *See United States v. Gordon*, 168 F.3d 1222, 1225 n.2 (10th Cir. 1999).

that at trial the government's witnesses provided further evidence that some cleaning had been done on the premises.

Accordingly, we will assume for the purpose of our analysis that the district judge did credit Mr. Higgins' testimony about the terms of his relationship with the property's owner. We focus then, on the district court's conclusion that Mr. Higgins was, at best, a business invitee who had permission from the owner to be on the premises for a specified purpose – to clean and repair the property. We agree with the district court that this status does not, under the circumstances here, grant Mr. Higgins an objectively reasonable expectation of privacy in the premises that society is prepared to accept. III Higgins App. at 513.

A worker may have an objectively reasonable expectation of privacy in his workspace, or portions thereof, depending on the circumstances. *See O'Connor v. Ortega*, 480 U.S. 709, 715-19 (1987). In the circumstances here, however, we agree with the district court that Mr. Higgins' work as part of a cleaning crew cannot serve as a basis for an objectively reasonable expectation of privacy in the whole of the premises. The premises here bear little resemblance to the offices, desks and file cabinets involved in *O'Connor* and the cases discussed therein. Moreover, Mr. Higgins does not base his privacy claim on his employment but on his claimed intent to convert the premises into his residence. Thus we shift our focus to the core of his argument.

Mr. Higgins argues that he was a resident, albeit one who was not yet staying overnight because of the condition of the property. The matter of residency *at the time of the search*, however, is of considerable importance in this Fourth Amendment inquiry, and the attempt to minimize its significance is unavailing. Moreover, here the *reason* that Mr. Higgins had not taken residence in the property – because it was uninhabitable – is also significant because it bears on whether Mr. Higgins' expectation of privacy is one that society is willing to accept as reasonable. The undisputed fact is that the property was not being used as a residence by anyone and could not reasonably have been so used.[4] This was clearly stated in Mr. Higgins' own testimony (III Higgins App. 457-58) and dramatically conveyed by testimony of Ms. Caple that after her arrest she became ill and had to be taken to the hospital because she had been "toxically poisoned" by exposure to the fumes in the house (*id*. at 481).

The government argues that in *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court created a bright line rule between overnight guests and persons present in another's residence only for business purposes. That may be overstating the holding of *Carter*, in which the deciding vote was cast by Justice Kennedy, who observed in his concurring opinion that "almost all social guests have a legitimate

_____

[4]Surprisingly, only counsel for Mr. Higgins asked the government's witness at the suppression hearing about the status of the condemnation proceedings on the property.

expectation of privacy . . . in their host's home." 525 U.S. at 99. Nevertheless, *Carter* is surely an important development in the law in this area. We have said that *Carter* "effectively heightened the burden for a defendant claiming a reasonable expectation of privacy in a dwelling other than his own home, when the defendant's presence in the dwelling is for a commercial or business purpose." *Gordon*, 168 F.3d at 1226. The parties have not brought to our attention any case closely analogous to the unusual circumstances here, in which the property was not at the time of the search usable as a dwelling, but the defendant professed to have plans to occupy the premises in the near future, after having cleaned and repaired the place.

Mr. Higgins argues that the district court ignored his testimony about having a key to the gate, having brought personal property into the house, and attributing his delay in moving into the house to the condition of the premises and the cold weather. As to the last of these points, we have already explained that the condition of the premises weighs very heavily against Mr. Higgins' position.

As to his possession of the key to the padlock on the fence and his having brought personal property into the abandoned house, we conclude that these facts make no difference in these circumstances. Although having possession of a key may be relevant, here Mr. Higgins' evidence failed to establish that locking the exterior fence made these premises secure. To the contrary, with the windows smashed out and the doors off the hinges, as described in Mr. Higgins' own

testimony on direct examination (III Higgins App. 457), it seems likely that the padlock was ineffective and that anyone wishing to do so could have walked right in, past the doors which were swinging loose on their hinges, or crawled in any broken window. Nor is such possibility merely theoretical. It appears from the evidence at trial that this had actually happened; indeed, the defense was centered on this possibility.[5] Thus, counsel for Defendants brought out in cross-examination of government witnesses and in direct examination of Mr. Higgins and Ms. Caple that chemicals were on the premises prior to the date of the arrests. In these particular circumstances, we can give no weight to Mr. Higgins' possession of the key because he failed to carry his burden of proving that this gave him control over the premises.

Similarly, Mr. Higgins' decision to keep personal property in the house carries little weight in view of all of the other facts. The facts that he had brought some personal property to the premises and that he had plans to reside there in the future may speak to his subjective expectation of privacy, but they fall short of establishing circumstances on which an objectively reasonable expectation of privacy could be based.

We conclude that Mr. Higgins' subjective expectation of privacy is not one

---

[5]We may consider the trial evidence in reviewing the denial of the motion to suppress. *See United States v. Corral*, 970 F.2d 719, 723 (10th Cir. 1992); *United States v. Rios*, 611 F.2d 1335, 1344 n.14 (10th Cir. 1979).

that society would recognize as reasonable. Therefore, we hold that the district court did not err in denying Mr. Higgins' motion to suppress the evidence seized from the premises and evidence developed from the search of the premises.

**D**

Mr. Higgins also argues that the district court should have reversed itself and granted the motion to suppress based on additional information presented to the court in a motion for new trial. The nature of the evidence relied on here is discussed in Part V, *infra*, and as discussed there, we find that the new evidence was not adequate grounds for the granting of a new trial. In short, as explained *infra*, the new evidence at most established that Mr. Higgins did have permission to clean the property. As explained, we assumed that the district court took that view at the suppression hearing and have concluded that even if it is assumed that Mr. Higgins had permission to be on the property, he still did not demonstrate an objectively reasonable expectation of privacy in the premises.

**III**

Defendant Jinks contends that he was unfairly prejudiced by the admission of certain evidence. Some additional background information is necessary to provide the context for Mr. Jinks' argument.

**A**

Among the substances found by the officers after Defendants' arrest were

bottles of iodine. A government witness explained to the jury that iodine is used in at least one method of manufacturing methamphetamine. Iodine is a legal substance and has legitimate uses including first aid, although there was evidence that iodine for household use is less concentrated and is much less expensive than that found on the premises at the time of the arrests. Iodine is also used by farriers and in purification of water.

In a pretrial filing, the government had given notice of intent to introduce evidence of four purchases of iodine by Mr. Jinks from October 28, 1998, to January 29, 1999 (about ten days before the arrests), and also of two purchases by Jinks of red phosphorus in October 1998. I Jinks App. 37-38. Counsel for Mr. Jinks filed a motion in limine to exclude this evidence. *Id*. at 39. The trial judge decided to permit the government to introduce evidence of the last iodine purchase by Mr. Jinks, but deferred ruling on the evidence of other purchases. IV Higgins App. 650-51.

The first witness at trial was an employee of a chemical supply store called Albuchemist. This witness explained that Albuchemist obtains iodine in lots which usually contain 100 bottles. He described the store's procedure for tracking its inventory. Each bottle is usually stamped, he said, with a six digit code derived from the date.

Iodine is among the legal chemicals that are subject to certain restrictions because of their potential for misuse. The witness explained that Albuchemist

requires purchasers of iodine to furnish identification and that records of sales are made available to law enforcement agencies. Customers are given a receipt on which the store usually writes the customer's name and the lot number of the item purchased. The witness identified a receipt reflecting a purchase of iodine by Mr. Jinks which showed that the bottle was from lot number 030498, indicating that Albuchemist had received that bottle in a shipment on March 4, 1998.[6] The store typically ordered 100 bottles at a time, although sometimes only half that number would be received.

The subject of Mr. Jinks' purchases of iodine from Albuchemist came up again during the testimony of Officer John Mallory, who testified about finding various chemicals, including iodine, in the search of the premises following the Defendants' arrests. Iodine and red phosphorus, another legal substance, were found in a portable cooler which had the name "Scott Higgins" on it. The bottle of iodine bore a sticker identifying it as coming from Albuchemist and the lot number 030498. Officer Mallory also explained how iodine and red phosphorus can be used in the illicit manufacture of methamphetamine.

---

[6]The government seems to have overlooked having the witness state the date of the receipt, and the trial exhibits are not in our record. From the arguments of counsel, which will be discussed *infra*, we infer that the receipt was dated January 29, 1999, or about ten days before the arrest of Mr. Jinks. Of course, the lot number affixed by the store reflects the date the store received the wholesale shipment, and thus it is commonplace, or we can easily infer that it is, for the date of retail sale to have been months later.

On request of counsel for Mr. Jinks, the trial judge permitted an unusual re-cross examination, which was not strictly limited to addressing new matter from the redirect examination. At that time, counsel brought out from Officer Mallory the fact that a second bottle of iodine with the same lot number had been found on the premises on the day the Defendants were arrested. When counsel's intention became clear, the trial judge warned him that he might be "opening the door" to evidence of other purchases of iodine by Mr. Jinks. VI Higgins App. 1174. Counsel proceeded in spite of the warning. The judge then permitted the government to show, through Albuchemist receipts identified by Officer Mallory, the three earlier purchases of iodine by Mr. Jinks.

**B**

Mr. Jinks now contends that the trial court erred in admitting the evidence of his three additional purchases of iodine from Albuchemist. We review decisions on the admission of evidence for abuse of discretion. *United States v. McIntosh*, 124 F.3d 1330, 1338 (10th Cir. 1997).

We first address Mr. Jinks' contention that the evidence was not relevant and so not admissible under Fed. R. Evid. 401. As we understand it, the argument is based on the fact that the evidence did not unequivocally prove that the iodine found at the scene had been purchased by Mr. Jinks. Counsel points to the testimony that Albuchemist usually received 100 bottles of iodine in a shipment. Thus, there likely

were 100 bottles with the same lot number. The fact that Mr. Jinks purchased at least one bottle from that lot (only one of the four receipts included the lot number of the iodine Mr. Jinks purchased) does not prove that either bottle at the scene was connected to him.

Although Mr. Jinks is correct that the evidence was not dispositive, we believe that it still was relevant. As the government states in its brief, "People who buy large quantities of precursor chemicals are more likely to manufacture methamphetamine than are persons who do not purchase large quantities of precursor chemicals . . . ." The evidence therefore comes within the definition of relevance in Fed. R. Evid. 401.

Mr. Jinks also argues that the evidence should have been excluded under Fed. R. Evid. 403 and 404(b). Like decisions on admissibility of evidence generally, decisions to admit or exclude evidence under Rule 404(b) are reviewed for abuse of discretion. *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir.), *cert. denied*, 531 U.S. 1043 (2000). Following *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988), we apply a four-part test which requires that:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts [evidence] is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

*Zamora*, 222 F.3d at 762 (quoting *United States v. Roberts*, 185 F.3d 1125, 1141 (10th Cir. 1999)).

We are convinced that the evidence here was offered for a proper purpose of showing intent or knowledge. We have already said that we find the evidence was relevant. Mr. Jinks asserts that the evidence was unduly prejudicial, but we do not agree that this evidence had substantial potential to cause the jury to decide the case on an emotional basis. The probative value of the evidence was not "substantially outweighed" by the potential for unfair prejudice; thus, the trial court did not abuse its discretion in applying the balancing test of Fed. R. Evid. 403.[7]

In sum, we hold that the district court did not abuse its discretion in admitting the contested evidence.

## IV

Defendants Caple and Jinks contend that the evidence against them was insufficient to support the jury verdicts. Their arguments take different tacks, and we will consider them separately. Our standard of review is well established. The sufficiency of the evidence to support a criminal conviction is a question of law to be reviewed *de novo*. In doing so, however, we view the evidence and all reasonable inferences therefrom in the light most favorable to the jury verdicts. *United States*

---

[7]Mr. Jinks did not request a limiting instruction, so we are not concerned with the fourth part of the *Huddleston* analysis in this case.

*v. Jenkins*, 175 F.3d 1208, 1215 (10th Cir. 1999).

## A

Ms. Caple's argument does not require extensive discussion. In essence, she relies on evidence which showed that some chemicals had been noted on the premises by various law enforcement officers in the weeks just before her arrest. She contends that "no rational trier of fact could distinguish the evidence concerning prior activity and that which allegedly occurred during the listed dates of the conspiracy." Defendant-Appellant Katie Sue Caple's Opening Brief at 39.

Ms. Caple also assails the testimony of Ms. Ortiz, pointing to her history of drug abuse, her having sustained a head injury which affected her memory, and her agreement with the prosecution. Ms. Caple asserts that the only proof that she "had taken any steps to manufacture methamphetamine came from" Ms. Ortiz, and that without that testimony "there was only circumstantial proof of active methamphetamine production, and this proof could not be distinguished from proof of obviously prior production." *Id.*

Ms. Caple's argument on appeal simply cannot succeed unless Ms. Ortiz's testimony is rejected almost in its entirety, as her own assertion makes clear. Notwithstanding the impeachment evidence against Ms. Ortiz, the jury was of course free to accept her account and to disbelieve Ms. Caple's protestations of innocence. And our function as a court of review prevents us from re-weighing the testimony

and coming to a conclusion at odds with the one reached by the jurors.

Moreover, there was additional evidence, some of which we omitted in our brief overview of the evidence *supra*. A recipe for methamphetamine manufacture was found in a purse seized inside the house, and there was testimony that the handwriting was consistent with a handwriting exemplar that Ms. Caple had given. Evidence of Ms. Caple's apparent attempt to disguise her handwriting in her initial response to the request for an exemplar could also have supported an inference of guilt. There was the presence of the pistol on the premises, and Ms. Caple's giving a false name and identification card when the officers first encountered her. There were the obvious incongruities in the testimony of Ms. Caple and Mr. Higgins, such as their having chosen to begin cleaning the house long before dawn when there was limited artificial light available. Some of the chemicals were found in a cooler with Mr. Higgins' name on it. Then there was the evidence of repeated purchases of large quantities of iodine by Mr. Jinks.

In sum, it is clear that the evidence, taken in the light most favorable to the verdicts, was sufficient.

**B**

Ms. Caple's challenge to the sufficiency of the evidence is almost so broad as to be, in effect, a challenge to the convictions of all three Defendants. Mr. Jinks' challenge to the sufficiency of the evidence, on the other hand, is focused more on

the evidence as it pertained to him individually. He asserts that there was no evidence that he had control of the premises and points out that he was not present at the scene when the officers arrived. He further contends that a careful reading of the testimony of Ms. Ortiz shows that her connection to the Defendants was through Ms. Caple and Mr. Higgins.

We conclude that the evidence was sufficient as to Jinks also. Although it is true that Ms. Ortiz testified that she did not see Mr. Jinks actively "cooking," her testimony implicated him in the overall efforts of the group. For example, she testified that he had purchased acetone, naptha and "distilled alcohol" for the methamphetamine production; that he kept a fire going in the fireplace while Ms. Caple and Mr. Higgins were trying to manufacture methamphetamine, the fireplace being the only source of heat in the house on that February morning; that Mr. Jinks kept the lights burning (there were camping lanterns at the scene); and that he was walking outside the house at times (from which the government asserts, and we agree, the jury could have inferred that he was keeping a lookout for the sake of the clandestine endeavor). Also, Ms. Ortiz testified that Mr. Jinks went with Mr. Higgins on his trip to find someone to assist him when his process wasn't working as planned. When the two men left, Mr. Jinks told Ms. Ortiz that they would be back in about two hours, indicating that he probably knew the purpose of the trip. Ms. Caple went to sleep at some point during the morning, and before she did, Ms. Ortiz

testified, she told Mr. Jinks to keep her pseudoephedrine powder out of the way while Ms. Ortiz was cleaning in the kitchen.[8]

Mr. Jinks does not contest the government's evidence that the jars of chemicals in the car when Mr. Jinks and Mr. Higgins arrived at the scene contained methamphetamine oil. As to the methamphetamine in the car, Mr. Jinks asserts that the evidence shows only his presence near the drug, not his ability to control or direct its destination. In light of the totality of the evidence, however, and in view of the fact that Mr. Jinks was charged in Count III with aiding and abetting under 18 U.S.C. § 2 as well as being charged as a primary violator, we hold that the evidence was sufficient to support the possession and conspiracy charges.[9]

As to Count 2, which charged maintaining a place for manufacture, possession or distribution of methamphetamine, the prosecution was required to prove that Mr. Jinks (1) knowingly (2) opened or maintained a place (3) for the purpose of manufacturing a controlled substance. *United States v. Williams*, 923 F.2d 1397, 1403 (10th Cir. 1990). Mr. Jinks' challenge to the sufficiency of the evidence on this count seems to go only to the second element. As to that element, the jury was instructed that the "maintaining" element required proof that Mr. Jinks exercised

---

[8]Pseudoephedrine is the primary ingredient for the methamphetamine manufacturing process Ms. Caple was using, as discussed further *infra* in part VI.

[9]We see no need to discuss elements of these offenses that Mr. Jinks does not specifically challenge.

control over the premises and that he was not a mere visitor at the house.

We conclude that the evidence outlined above was sufficient to support the conviction of the offense of maintaining a place for manufacture of methamphetamine. As we have said, Ms. Ortiz testified that Mr. Jinks was walking outside, and the jury could have inferred from that testimony – combined with all the other evidence of Mr. Jinks' knowing involvement and assistance in the methamphetamine manufacturing process – that he was keeping watch for intruders or authorities. Further, he was keeping the others supplied with heat and light, as much as the circumstances permitted. Finally, Mr. Jinks was charged with aiding and abetting in this count, and the evidence was certainly sufficient for conviction on that basis.

## V

Mr. Higgins and Ms. Caple assert error in the district court's decision to deny a motion for a new trial and a subsequent motion to reconsider the denial of that motion. At trial, counsel for Mr. Higgins had represented to the court that she had been unable, despite repeated efforts, to serve a subpoena on Mr. Sappington, the owner of the property where Defendants had been arrested. Counsel informed the court that her intention had been to have Mr. Sappington testify that he had indeed agreed to have Mr. Higgins clean the place. Mr. Sappington had given an interview to Mr. Higgins' counsel before trial, which was transcribed. When the case came to

trial, Mr. Sappington allegedly avoided the process server hired by counsel for Mr. Higgins.[10]

Counsel for Mr. Higgins first moved to introduce the transcript of the interview with Mr. Sappington. When the trial judge ruled that the transcript was inadmissible, counsel was allowed to introduce the testimony of the process server to show the efforts that had been made to serve the subpoena on Mr. Sappington. Then, after all three Defendants had rested and the government was preparing to present its rebuttal witness, one of the prosecutors revealed that an agent had spoken to Mr. Sappington the previous evening and again immediately before the court session that morning. Although that contact with Mr. Sappington was to become the focus of the motion for a new trial, the motion to reconsider the denial of the motion for a new trial, and at least one related discovery motion, at the time none of the Defendants' attorneys reacted to the news that the government had been able to contact Mr. Sappington.

After the trial, counsel for Mr. Higgins filed a motion for a new trial, which was styled "Joint Motion for New Trial" and was apparently treated by the court and the government as having been joined by Ms. Caple and Mr. Jinks. The motion was based in part on the allegation that officers acting on behalf of the government had

---

[10]Counsel for Mr. Higgins had not tried to obtain Mr. Sappington's testimony for the hearing on his suppression motion.

-29-

committed misconduct in violation of Defendants' rights by actively discouraging Mr. Sappington from accepting service of a subpoena to testify at the trial. The motion for a new trial was denied. Mr. Higgins then retained new counsel, who filed a motion to reconsider and a motion for discovery. Counsel for Ms. Caple filed a document styled "Statement of Joinder" to join the motions to reconsider and for discovery.

In the motion to reconsider, Mr. Higgins pointed out that in the order denying the motion for a new trial, the judge had only discussed the ruling on the proffered hearsay evidence of the transcript of the interview and had not specifically addressed the argument of interference with constitutional rights by prosecutorial misconduct. In support of the motion to reconsider the denial of the new trial motion, Mr. Higgins offered new evidence, primarily affidavits from persons acquainted with Mr. Sappington, supporting the contention that government agents had "encouraged" Mr. Sappington to remain unavailable to defense counsel. Counsel also attached an application for a wiretap order, filed within a month after Defendants' arrests, which showed that the government was investigating Mr. Sappington's possible involvement in methamphetamine manufacturing.

Two hearings were held on Defendants' requests for discovery. The government produced affidavits from agents to show that there were no agreements with Mr. Sappington and that there had been no attempt to discourage Mr.

Sappington from testifying at trial. Mr. Higgins produced an affidavit from Mr. Sappington. In his affidavit, Mr. Sappington said that he "was aware" that Mr. Higgins was going to be on the premises "for a while to get the place cleaned up." II Higgins App. 352. Mr. Sappington did *not* say that he had been encouraged by the government to avoid service of a subpoena to testify at trial.

The district court denied the motion to reconsider. We note that the only support for the allegations of governmental misconduct came from affidavits of persons who related comments made by others. Although the court made no specific findings on those allegations, in comments from the bench the judge referred to the lack of evidence to support the allegations. VII Higgins App. 1532, 1540 The district judge based his ruling on the conclusion that Mr. Sappington's testimony was not shown to have been material, stating in a written order that although the affidavit from Mr. Sappington did support the defense theory that he had authorized Mr. Higgins to be on the property to clean it up, this was only of "marginal relevance" in light of the totality of the evidence. II Higgins App. 365.

A denial of a motion for a new trial in a criminal case is reviewed for abuse of discretion. *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999), *cert. denied*, 529 U.S. 1029 (2000). Rule 33 of the Federal Rules of Criminal Procedure authorizes a district court to grant a new trial if required in the interests of justice, providing in pertinent part:

On a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require. . . . . A motion for new trial based on newly discovered evidence may be made only within three years after the verdict or finding of guilty. . . . . A motion for a new trial based on any other grounds may be made only within 7 days after the verdict or finding of guilty or within such further time as the court may fix during the 7-day period.

Here, the motion to reconsider clearly was far outside the seven day period provided for motions for a new trial, and so the trial court had no jurisdiction to consider the motion absent a showing of newly discovered evidence. *See Quintanilla*, 193 F.3d at 1148. Mr. Higgins' motion to reconsider implied that information regarding Mr. Sappington was newly discovered, and the trial judge, aware of the restrictions imposed by Rule 33, seems to have implicitly found that the motion was indeed based on newly discovered evidence, as he proceeded to decide the motion on its merits. We proceed, then, to review the district court's ruling on the merits.

A five-part test must be applied in determining whether this "newly discovered evidence" warrants a new trial. Defendant must show (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by her own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Quintanilla*, 193 F.3d at 1147 (citation omitted).

After careful study of the record and the briefs, we are convinced that the district judge did not abuse his discretion in denying the motion for a new trial and the motion to reconsider. Mr. Higgins failed to provide persuasive evidence to

support his theory that the government had actively discouraged Mr. Sappington from testifying.

Moreover, we agree with the district judge that, based on the showing made by affidavit, Mr. Sappington's testimony would not have been material. We note that it was essentially uncontested at trial that the Defendants had indeed done some cleaning of the premises. Law enforcement officers testified that the place was cleaner than it had been just a few days earlier, and it was undisputed that cleaning supplies were found in the house. Ms. Ortiz, whose testimony was the most damning, said that she and the other Defendants had been cleaning the house. There was no evidence to contradict this testimony. In short, it seems clear beyond doubt that the jury found that the defendants were manufacturing methamphetamine *in addition to* cleaning the premises. We have already discussed briefly the evidence showing that the Defendants were engaged in methamphetamine manufacturing. Based on the showings made by counsel in the various affidavits submitted below, we cannot conclude that any testimony that Mr. Sappington might have given would have had any effect on the jury's decisions.

## VI

All three Defendants contend that the trial court erred at sentencing in calculating the amount of methamphetamine to be attributed to them. Out of all the evidence found at the scene, for sentencing purposes the government relied primarily

on samples of two quantities of pseudoephedrine hydrochloride, a precursor chemical. For reasons explained below, the district judge relied entirely on testimony concerning those two samples. Pseudoephedrine or pseudoephedrine hydrochloride (the testimony is often unclear as to which is being discussed) had been found in a number of places on the premises, including in two coffee filters as recited above, the sources of the two samples on which the Defendants' offense levels were ultimately based. The government had preserved only samples of those two quantities, the remainder having been destroyed by a contractor which cleans up such sites for the Drug Enforcement Administration.

Ms. Tamara Dallabetta-Keller testified as the sole government witness at the sentencing hearing, which like the trial itself was a joint proceeding involving all three Defendants. Ms. Dallabetta-Keller is a chemist for the DEA laboratory in Dallas. She testified that she had concluded that the pseudoephedrine in the two coffee filters was capable of yielding 153.9 grams of methamphetamine.

Ms. Dallabetta-Keller's conclusion was based on extrapolation from the two sample quantities of pseudoephedrine that had been furnished to her. She determined the purity of the samples was 82% and 89%. However, for the quantity of seized pseudoephedrine hydrochloride, she had to rely on estimates that had been provided to her, estimates which she understood to have been made by agents at the scene on the day of the arrests. An unidentified officer on the scene had estimated that one

coffee filter contained about 100 grams and the other about 150 grams.

The chemist said that she used the estimates of 100 grams in each of the two coffee filters[11] and multiplied by the percentage of purity to get a total estimated weight of pseudoephedrine. She then assumed a ninety percent conversion (i.e., that the Defendants' process would convert each gram of precursor into .9 grams of methamphetamine) to reach her estimate of 153.9 grams. This was based on the assumption the process would have been as efficient as theoretically possible.

Defendants also proffered expert testimony at the sentencing hearing. Their expert worked in quality control of laboratories. She produced an estimate of the potential yield of methamphetamine based only on the samples tested by the government's chemist because the government had not weighed the seized precursor chemical, the pseudoephedrine hydrochloride. She also questioned the assumption that the purity of the sample was representative of the mass from which it was taken. The defense expert also testified that the conversion ratio should have been .7 instead of .9, in other words, that one gram of pseudoephedrine could produce only .7 grams of methamphetamine rather than .9 grams. Her estimate of the amount of methamphetamine that could have been produced was four grams.

---

[11]As noted, the field estimates had been 100 grams for one quantity and 150 grams for the other. The only explanation given for the chemist's decision to reduce the second estimate by one-third is that she "didn't like" the higher estimate. VIII Higgins App. 1617.

The district court rejected the defense expert's conclusion because it was based only on the sample tested, not the quantity seized. But the judge also expressed concern with the government's estimate because of the failure to measure the seized precursor, saying:

> The question is, how do I get to a number? I agree with [the prosecutor] that four grams seems highly improbable based on the evidence in the case. But where do I get a number? And how reliable is it? I think those are the questions on the table. Particularly since they didn't weigh it.

VIII Higgins App. 1671.

Nevertheless, the judge concluded that the method of the government's expert was "unassailable." Even so, he said that "[t]he problem comes in what Ms. Keller [the government chemist] received to test, whether or not it's a representative sample. And more importantly, what the total quantity was." *Id.* at 1673. Eventually, the judge decided to accept the government's estimate of quantity of precursor but, making reference to an unpublished opinion from another circuit, *United States v. Murks*, 145 F.3d 1334 (6th Cir. 1998) (table), he applied a conversion ratio of fifty percent, rather than the ninety percent figure used by Ms. Dallabetta-Keller, thus arriving at a quantity of 77 grams.

The district court's determination of drug quantity is reviewed only for clear error. *United States v. Nieto*, 60 F.3d 1464, 1469 (10th Cir. 1995). The determination may be an approximation and the government's burden is only the

preponderance of the evidence. *United State v. Becker*, 230 F.3d 1224, 1234-35 (10th Cir. 2000), *cert. denied,* 121 S. Ct. 1666 (2001). Nevertheless, the estimate used to establish the offense level under the Guidelines must have "some basis of support in the facts of the particular case" and must have "sufficient indicia of reliability." *United States v. Wacker*, 72 F.3d 1453, 1477 (10th Cir. 1996) (quoting *United States v. Garcia*, 994 F.2d 1499, 1508 (10th Cir. 1993)). "[W]hen choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution." *United States v. Richards*, 27 F.3d 465, 469 (10th Cir. 1994) (quoting *United States v. Ortiz*, 993 F.2d 204, 208 (10th Cir. 1993)). The need to rely on an estimate is "not a license to calculate drug quantities by guesswork." *Id*. (quoting *United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir. 1993)).

The expert's estimate in this case was based on the field estimate of the quantities in the coffee filters. These estimates did not have sufficient indicia of reliability; indeed, they had *no* indicia of reliability. On cross-examination Ms. Dallabetta-Keller testified that she did not know who made the estimates of the amount of pseudoephedrine in the coffee filters, nor did she know how the estimates were made:

Q. And you don't know who made the estimate?
A. No.
Q. And, of course, *nothing at all about the accuracy of the estimate?*
A. No.

-37-

VIII Higgins App. 1615 (emphasis added).[12]

Ms. Dallabetta-Keller testified that different powdery substances have different densities. There was no evidence that the unidentified person who made the estimate at issue here (by an unknown method) had any knowledge about the density of pseudoephedrine. The chemist testified that the acceptable method would have been to weigh the substances, which could have been done at the scene or at the DEA laboratory in Dallas. Most importantly, she herself would not hazard to make an estimate of the quantities. When asked if she, as a chemist, would "attempt to say what they weighed without actually weighing them, she said, "Not normally, no." *Id*. at 1622-23. The cross-examination continued:

> Q. You wouldn't do that now either, would you?
> A. Absolutely not.

*Id.* at 1623. It seems clear that the refusal to make an estimate was because there was no scientific basis for estimating quantity from appearance. In any event, the result was that the government's own witness disavowed the method by which the estimate of the quantity of the precursor chemical had been made.

---

[12]As Defendant Jinks states in his opening brief, Ms. Dallabetta-Keller, the witness on whose testimony the government depended,
> did not know what was included in that estimate, did not know if the coffee filters were included, did not know who made the estimate, did not know anything of the accuracy of the estimate, and did not know if the estimate was arrived at by weighing or "eyeballing" it.

[Jinks'] Opening Brief at 51-52.

The government contends that this proof met the unexacting standards set by our cases, but we cannot agree. Although the trial judge characterized the chemist's method as "virtually unassailable," in view of his manifest distress about the field estimates we can only conclude that he was referring to the testimony exclusive of that critical part. In any event, the witness herself explicitly disavowed the method of estimation of the quantities at the scene for obvious reasons. Although it is clear that the defense expert's conclusion understates the amount of methamphetamine that the clandestine laboratory could have produced, the government simply provided no reasoned basis for determining the degree of underestimation. We are left with a result that cannot be said to be more than a guess, and we hold that the district court erred in determining Defendants' sentences on such a basis.

The government alternatively argues that a greater quantity could have been proven had the chemist taken into consideration all of the materials seized at the scene. The problem with this contention is that the chemist did not do so. Apparently aware of the problems with its proof, the prosecution asked the chemist the night before the hearing to study the trial exhibits and other materials in her hotel room and to make an estimate of the quantity of methamphetamine that could have been produced from the other chemicals seized. The chemist noted that four other quantities seized at the scene contained pseudoephedrine, and she gave an estimate of the amount of methamphetamine that might have been produced from these

exhibits. However, she did not know the purity of these exhibits, so she included the entire quantities rather than multiplying by the percentage of purity as she had done when doing her work in the laboratory.

Ms. Dallabetta-Keller also testified about the quantities of iodine and red phosphorus seized at the scene, and the government urges that a higher quantity of methamphetamine could have been produced with these substances. These chemicals are not precursors, however, and Ms. Dallabetta-Keller testified that they were "useless" without additional pseudoephedrine and that, consequently, the manufacturing capacity was best estimated as she had done originally, by using the amount of pseudoephedrine. VIII Higgins App. 1631.

The trial judge received all of this evidence of alternative estimations conditionally, acknowledging defense objections that no opportunity had been given to prepare for these alternative methods of estimating the potential output of the Defendants' illicit laboratory. The judge told counsel that he would permit some opportunity for preparation if he decided to consider this testimony, but in the end he did not consider it. We decline the government's invitation to affirm the Defendants' sentences on the basis that Ms. Dallabetta-Keller's testimony could have supported a finding of an even greater quantity of methamphetamine than the amount on which the sentences were based. The district court did not make any findings on this testimony. It is not the function of this court to make such findings, and we are

especially unwilling to do so on the basis of this testimony, which is not free from doubt.

In conclusion, we hold that the district court erred. The government failed to carry its burden of proof and instead supplied only guesswork as the basis for calculating the quantity of methamphetamine that could have been produced. Consequently, we remand for further sentencing proceedings.

**VII**

Finally, we turn to issues under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). These are issues which have arisen frequently since the *Apprendi* decision and which, in the circumstances presented here, are easily resolved under our recent precedents. Ms. Caple, parroted by Mr. Higgins, urges error in the trial judge's refusal to require the jury to determine the quantity of drugs involved in the offenses, arguing that the quantity of drugs must be treated as an element of the crime.[13]

We have held that drug quantity is an element of the crime which must be alleged and proven beyond a reasonable doubt *"if that fact exposes the defendant to*

---

[13]Both Ms. Caple and Mr. Higgins say that they preserved the issue by filing objections before sentencing, and Ms. Caple did raise the issue before trial. That is insufficient, however. Any error was forfeited if the Defendants failed to object before submission to the jury. Our record does not include the transcript of the court's instructions to the jury, and the government does not contend that the issue was forfeited. Therefore, we cannot determine if the issue was properly preserved, and our standard of review is unclear. However, the result would be the same under any standard.

*a heightened maximum sentence . . . ."* *United States v. Jones*, 235 F.3d 1231, 1236 (10th Cir. 2000) (emphasis added). None of these Defendants' original sentences were in excess of the statutory maximum applicable to a quantity of methamphetamine either indeterminate or less than five grams. Therefore, no violation of *Apprendi* occurred, or in any event there was no prejudice to the Defendants from the fact that the jury did not make a quantity determination.

## VIII

Accordingly the convictions of Defendants-Appellants Higgins, Caple and Jinks are affirmed. The causes are remanded to the district court for whatever further sentencing proceedings the district judge deems appropriate, *see, e.g., United States v. Keifer*, 198 F.3d 798, 800-801 (10th Cir. 1994), and for the imposition of new sentences thereafter in accordance with this opinion.

IT IS SO ORDERED.