**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 21 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

vs.

TROY ALLEN GORMAN,

      Defendant - Appellant.

No. 02-4116
(D.C. No. 2:01-CR-476 W)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Judge, **HOLLOWAY**, and **KELLY**, Circuit Judges.

Defendant-Appellant Troy Allen Gorman was indicted on one count of

possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1)

("Count I"), one count of possession of a firearm by an unlawful user of

controlled substances, in violation of 18 U.S.C. § 922(g)(3) ("Count II"), and one

count of possession of marijuana, in violation of 21 U.S.C. § 844 ("Count III").

Following the district court's denial of his motion to suppress the evidence seized

during a search of his person and its denial of various other pre-trial motions, Mr.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Gorman pleaded guilty to Count I, and the government dismissed Counts II and III. In so doing, Mr. Gorman reserved his right to appeal the district court's orders and rulings denying his pre-trial motions. The district court thereafter sentenced Mr. Gorman to 57 months of imprisonment, and this appeal followed. On appeal Mr. Gorman argues that (1) the district court erred in denying his motion to suppress because the officers searched him without a reasonable belief that he was armed and presently dangerous, and (2) the district court erred in adding two criminal history points at sentencing pursuant to a prior, deferred sentence. Our jurisdiction arises under 28 U.S.C. § 1291, and we REVERSE.

Background

The relevant facts as found by the district court are as follows. On September 20, 2000, Mr. Gorman was a passenger in a vehicle stopped by Deputy Jason Ashment ("Ashment") for a broken taillight and expired registration. While he was issuing the driver a citation, Ashment noticed some wires protruding from under the driver's seat that appeared to be attached to some stereo equipment. Because it was early in the morning and several automobile burglaries had occurred in the area, Ashment questioned the driver about the equipment and asked for, and obtained, consent to search the vehicle. After the driver voluntarily exited the vehicle, Ashment repeatedly asked Mr. Gorman to do

likewise so as to permit a search of the car. Mr. Gorman refused to comply with these requests, however, and stated to Ashment his belief that he had a right to remain in the vehicle. By this time three other deputies had arrived on the scene, which freed Ashment to focus his attention on the driver. The newly-arrived deputies also ordered Mr. Gorman from the car, and "advised him that we wanted to search him for weapons." II R. at 57. After Mr. Gorman continued to refuse to exit the vehicle due to his reluctance to be searched and his belief that he had a right to remain inside, one of these officers, Deputy Jason Mudrock ("Mudrock"), opened the door to the vehicle, at which point Mr. Gorman voluntarily began to exit and was ordered to "step on to the sidewalk and place his hands on top of his head so he could be searched for weapons." I R. Doc. 33 at 4.

The district court found that when Mudrock commanded Mr. Gorman to place his hands on his head, Mr. Gorman "turned away from the officers and placed his hands out of sight and to his waistband," and that this conduct occurred "exactly as he was getting out of the car." Id. at 7. Upon witnessing Mr. Gorman's conduct, and after he had taken a few steps away from the officers in a northbound direction, II R. at 48-49, Mudrock grabbed Mr. Gorman and pinned him against a nearby wall, reached around to the front of his waistband, and retrieved the unloaded handgun at issue. II R. at 40, 61-62, 68-69, 72.

<u>Discussion</u>

When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government, and accept the district court's findings of fact unless clearly erroneous. <u>United States v. Higgins</u>, 282 F.3d 1261, 1269 (10th Cir. 2002). Moreover, we review de novo the district court's ultimate determination of reasonableness under the Fourth Amendment. <u>Id.</u> Whether police conduct is reasonable under the Fourth Amendment is "measured in objective terms by examining the totality of the circumstances." <u>Ohio v. Robinette</u>, 519 U.S. 33, 39 (1996).

The standard for determining whether a protective search for weapons in the absence of probable cause to arrest or search is reasonable under the Fourth Amendment has been established since the Supreme Court's landmark decision in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). In <u>Terry</u>, the Supreme Court concluded that an officer may conduct a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." <u>Id.</u> at 27. In <u>Ybarra v. Illinois</u>, 444 U.S. 85, 92-93 (1979), the Supreme Court reaffirmed this holding by stating that in the absence of probable cause, a protective search of a person is justified under the Fourth Amendment only if the officer has a "reasonable belief that [the defendant] was armed and presently dangerous, a belief which this Court has invariably held must

- 4 -

form the predicate to a patdown of a person for weapons." See also United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996).

The government cites three factors which it believes combine to provide the necessary reasonable belief here: (1) Mr. Gorman's persistent refusal to exit the vehicle when ordered to do so, (2) his production of a small pocket knife after the officers asked him, while he was still seated in the vehicle, whether he had any weapons, and (3) his "furtive movements"upon exiting the vehicle consisting of turning away from the officers, taking "several steps" away from them, and placing his hands near his waistband area. Aplt. Br. at 12-13. We disagree.

As to his reluctance to exit the vehicle, we note that Mr. Gorman did eventually exit the vehicle voluntarily, and that upon doing so he was ordered by the officers to step onto the curb so he could be searched, even though the officers had no reason to believe at that time that he was either armed or presently dangerous. II R. at 54, 71. Furthermore, we fail to see how Mr. Gorman's possession and subsequent surrender of a small pocket knife is relevant to the question of whether he was armed and presently dangerous prior to his being searched.

We are left, therefore, with the movements made by Mr. Gorman upon exiting the vehicle. The government appears to place primary importance on the fact that Mr. Gorman's hands disappeared from the officers' sight at some point

after he exited. Aplt. Br. at 12-15. Moreover, the record reveals that it was this conduct which led the officers to be concerned for their safety. Indeed, Officer Mudrock testified:

> Through my training and experience it is believed that a lot of people carry weapons in their waistband and we are taught at the academy and through our training that as soon as the hands disappear that is a safety hazard for us, and at that point I felt in fear for my safety as well as the other deputies on scene.

II R. at 62. Clearly, the deputies who eventually restrained and searched Mr. Gorman were responding to the fact that Mr. Gorman's hands were for some period of time out of their line of sight. However, the testimony was uncontroverted that the officers (1) observed no bulge in Mr. Gorman's clothing that could have indicated the presence of a weapon, id. at 55, 71 (2) had no reasonable belief that he was engaged in any criminal activity, id. at 71, and (3) had no reason to believe, other than the movement to his waist upon exiting the vehicle, that he could have been armed and dangerous. Id. at 70, 71. This case thus stands in stark contrast to the permissible search in Terry, where the court found that the officer was justified in his belief that the defendant could be armed and dangerous because he observed the defendant acting as though he was preparing to commit a day-light robbery "which, it is reasonable to assume, would be likely to involve the use of weapons." Terry, 392 U.S. at 28.

Moreover, because the officers could point to nothing indicating that Mr.

Gorman might have been armed and dangerous *prior* to his alleged hand movement to his waist, no reasonable suspicion existed to justify the order for Mr. Gorman to step to the curb and place his hands on his head so he could be searched. Therefore, the fact that Mr. Gorman refused to obey this order upon exiting the vehicle cannot furnish any degree of suspicion. Cf. Wright v. Georgia, 373 U.S. 284, 291-92 (1963) (noting that "one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution.")

Consequently, to hold that the protective search here was consistent with the strictures of the Fourth Amendment would be to hold that a Terry "frisk" of a person is justified any time his or her hands go outside of the officers' view, even though the officers lack a reasonable suspicion that the person is engaged in criminal activity and have no other specific indication that the individual might be armed and dangerous. Although we are mindful of our obligation to assess the reasonableness of the officers' conduct by looking to the totality of the circumstances, we are satisfied that consideration of all the factors cited by the government does not support the conclusion that the officers were reasonable in their belief that Mr. Gorman was armed and presently dangerous. We therefore reverse the district court's denial of Mr. Gorman's motion to suppress the handgun. In light of this conclusion we need not address Mr. Gorman's argument

that the district court erred in calculating his criminal history category.

REVERSED and REMANDED.


Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

*02-4116, United States of America v. Gorman*
**TACHA** , Chief Circuit Judge, dissenting

I respectfully dissent.  Considering, as we must, the totality of the circumstances surrounding the search, I would hold that the officers had an objectively reasonable, articulable suspicion that the defendant was armed and dangerous.

Defendant does not challenge as unlawful the initial stop of the vehicle in which he was a passenger.  Nor can he challenge the legality of his being ordered from the car during a search pursuant to that stop.  *Maryland v. Wilson* , 519 U.S. 408, 415 (1997); *Pennsylvania v. Mimms* , 434 U.S. 106, 111 (1977).  His only colorable assertion is that the officers who ultimately seized and searched him lacked the necessary reasonable and articulable suspicion that he was armed and dangerous.  *E.g., United States v. Davis* , 94 F.3d 1465, 1468 (10th Cir. 1996) ("In the course of a valid investigative detention, an officer may conduct a limited protective search ('frisk') if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous.").

In arguing that the officers lacked any basis upon which to harbor the necessary level of suspicion, defendant makes much of his voluntary surrender of a small pocket knife.  I am at a loss to perceive what relinquishing a Swiss-Army knife, while retaining a handgun, demonstrates under the relevant analysis.  I am

equally at a loss, however, to discern the government's point in touting the surrendered pocketknife as evidence that the defendant was "armed and dangerous" when they later searched him. Our task is to determine, divorced from questionable characterizations of the facts, whether the officers acted reasonably under the totality of the circumstances. In doing so, we must give "due weight . . . not to [any] inchoate and unparticularized suspicion or 'hunch,' but to the specific and reasonable inferences which [they were] entitled to draw from the facts of [their] experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

The majority quotes—but, I think, gives insufficient weight to—Officer Mudrock's testimony that, in his experience and as a result of his training, he feared for his safety when, under the tense circumstances in which the officers finally convinced the defendant to exit the vehicle, the defendant's hands disappeared in the region of his waistband. I give some credence here to the proposition that, in the experience of these officers, individuals traditionally carry weapons in this area of their clothing. *See id.* I would, therefore, hold that the defendant's furtive movements upon finally exiting the vehicle and his reaching for the waistband area of his pants while stepping away from the officers combined to provide the necessary reasonable suspicion upon which the officers relied to search that area of his clothing, in which they found the handgun defendant seeks to suppress. To hold otherwise, it seems to me, fails to give the

weight *Terry* instructs us to give to the reasonable inferences the officers were entitled to draw from their experience. *Id.*